We'll move now to Appeal 25-2019, Anna's Cafe Place LLC v. Village of Westchester et al. We'll begin with oral argument from the appellant, Mr. Bolton. May I please support? Your honors, I'd like to use my short amount of time as I've observed in five minutes through the bottle to get what I've moved on some of the key issues but it's admittedly an area of law in the circuit which as district court said is in flux. However, we believe that the unique fact of this case that the admissions of the village president were that there was animus and that this license would never under any circumstances ever be granted to this man presents a unique circumstance that gives definition to some of the currents within that flux, your honor. I was struck, your honors, in reading the Olek opinion in the Supreme Court that they provided a definition for that Sioux City Bridge case that didn't mention irrationality in the decision of the 14th Amendment. They said the 14th Amendment, it is protection against intentional and arbitrary discrimination, not irrationality. So when we talk about the rational basis test which was employed by the court below, the problem becomes that the rational basis test becomes an unfortunate shield to intentional harm. I present the scenario that if a mayor actually wrote an affidavit saying it was all intentional, it was animus, I meant every bit of it, it had nothing to do with the statutes, I just wanted to harm you, signed under oath, but because the district court would find that I had a rational basis for doing it, you lose. And we'd ask the court, is that justice? We don't believe it is. And we believe that that is tantamount to what occurred here because the village president admitted to Michael Manzo as to what was going on. And we presented in our amended complaint, Your Honor, all the prior actions with regard to the parking violations and the parking appeasement, all the previous history of Michael Manzo in exposing the red light camera scandals of the Western suburbs to show that there was not, it's not casual, there was actual real animus politically against this man, and it was visited upon his business. And while district court said that animus towards Michael Manzo was not animus towards Annis Cafe, that's not what the mayor said. The mayor said, no, it's because it is, you're never going to get that license because of you, they want you. And you just, Judge Easterbrook, I carefully read your concurrence in the Del Marcelle case in which you stated that intent should never have any effect. I believe that this case presents strains upon that analysis because if we go down that road, that any time that there is a conceivable rational basis, we are creating a potential shield for intentional harm. For example, if a man is holding another man by the hand over a cliff face, the intention to let's go on video, would we say that, well, because the grip might've slipped, we should absolve him because it might've happened by other means anyway. So his intent in what he did didn't matter. We would say, no, we would say there's intentional harm here. And that intentional harm has to be addressed under the Equal Protection Laws. So that winds us into, Your Honors, the issue of Ms. Hedlund, because what happened here was the rationale is there was no license there. But in the amended complaint, we demonstrate that the reason why there was no license available was that the village official directed them into filing a separate application on their own, as opposed to trying to renew the existing license for the Christopher's Speakeasy Restaurant. Mr. Bolton, did Annas ever purchase or enter into an executed lease for Christopher's? They did not actually enter into an agreement, Your Honor. They had an oral agreement with the owner of the land who had opened the place for his nephew. But no, Your Honor, I have to say, it was not an actual executed document. There was an oral agreement among them, which is why Manzo and Annas were trying to get a move towards Christopher's. Don't the Westchester ordinances prohibit the issuance of a license like this to someone who does not own or lease the premises? Well, the way we read them, Your Honor, the new owner is going to have to go through the same process. It isn't barred, but there's no automatic renewal. You cannot hide behind the prior owner. You must show on your own, as part of your application, that you meet the requirements of the village of Westchester. We see that as a protection of the village that people can't slip in behind one license. They're not appropriate for the license, and therefore, if there's no scrutiny, no, the new owner's going to have to prove their worth. So they had to file a new application under village regulations, right? As part of their application for renewal, not an application for a new drive-thru. As a part of their renewal application, they would have had to have demonstrated before this panel that they were property owners and they met all of the requirements. Only the renewal, not the original? Excuse me, only the renewal application? They would have to have done for both, it seems to us, because they would have been new applicants on their own, or they would have been the new owners coming in on behalf of Christopher. So there would have been scrutiny either way. We agree with that. But what happened was the rational basis used here was, well, there was no license, because there were only two. There was Christopher's and there was Anna's on Roosevelt. So since there was no new license even applied for, there was a rational basis. But that also overlooks that the village had the opportunity to, the village had the ability to create a third license if they wanted to. This is completely within the parameters of that village trustee of the village review board and the village board itself. That licensure decision includes discretion, correct? Yes, Your Honor. I don't disagree with that. How does that affect the allegation that there's a problem? Well, Your Honor, there's a property right that can be not in an application. You understand that. There's a property right in the license itself. So there would've been a problem, right? Had we gone down the road of renewal, as opposed to simply applying on our own. So I think we moved, and we attended through a trial, that that was part of the whole game here, that take them away from the actual existing license, make them apply on their own. They are easy targets once they do that. We could easily deny it without any sort of possibility of liability. And I think I, bluntly, Your Honor, our contention was that Mr. Manzo was set up by the village time, after time, after time. None of this was on intention. And then they go to the authority, Ms. Hedley. Well, she was the village economic director. They admitted in their brief that she was the point person on applications. But most tellingly, she was the one who came back to Manzo and said, oh, if you drop gaming out of your application, we might consider it. Which, in this context, is a little like going to a liquor store and saying, well, if you stop selling liquor and only sell cigarettes, we might give you a license. It defeats the whole purpose. But this is the woman that came to them with that offer, Your Honor. So to say that she had no authority, it seems to us, that's a question for discovery. That's a question for fact development. That's a question for further down the road. That's a question that can't be decided on. Well, be six inch. Your Honors, it also, going back to the rational basis, Your Honor, for one moment, we are not asking this court to abolish rational basis test in any way, shape, or form. We're simply saying that this case presenting the admission of the village president that there was animus and animus motivated the decision that happened here. Although I would also add, Your Honor, there was no decision. That application was never ruled on. To this day. Excuse me? To this day. To this day, Your Honor. As well, Your Honor, that parking variance that we described as part of the animus, that's never been ruled on in the Bill of Westchester to this day, by your side. So our point is, is that there's more evidence of animus in the way this worked than just the expressions of the village president,  Well, what we're saying, Your Honor, is that the unique circumstances of this case where there is that admission, tests like rational basis and comparative. That these, this case with that admission and that witness is available to testify if he'll be proposed, he'll be called to trial. He actually is now the ex-village president. But I'd also add that his successor also came in and talking about the variance. It said like, you're not getting that variance because they're against you because of red light cameras. Our point, Your Honor, is that when we get that kind of an admission, it takes this case away from those tests. Those tests are excellent, we think, in some ways for divining discrimination. But we think that there's a mistake when they are used to simply define discrimination because as I said, they can become a shield for intentional harm, which isn't right. Um, Your Honor, unless there are questions, I'd raise the points that I thought we needed to raise here, but the court has questions on behalf of me, too. Very good, you may reserve the remainder of your time. I'm reserving my five minutes, Your Honor. Excellent, thank you very much, Mr. Bolton. Thank you. We'll move now, Mr. Warren, to you for oral argument on behalf of the applicant. Good morning. May it please the court. Thank you very much for your time this morning. What was glossed over by the appellant is the standing issue that we raised in our brief. And it really is central to why we're even before you. The allegations that Mr. Bolton has raised about the non-renewal of a license, saying that they were denying the ability to go forward and renew their license, it wasn't their license. As you point out, they never purchased. The Christopher Speakeasy business, they never obtained any of its assets. Therefore, they are not in a position to be able to argue that their due process rights were denied. They did not have a right to a liquor license because they did not complete the purchase of Christopher Speakeasy. With each complaint- So the claim sounds like your contention is that they lose on the merits. What does that have to do with standing? As I understand it, standing requires the injury in fact, caused by the defendant and remediable by the court. They want a license. The lack of a license is caused by the defendants. And it's remediable by a decision requiring them, requiring the defendant to give them a license. Now, it may be that they're not entitled to that, but how is that a lack of standing? Yes, Your Honor, I agree that our position would be victorious either way. And in fact- No, there's a big difference between lacking standing and losing on the merits. And you seem to be alighting that difference. You're saying that people who can't win on the merits lack standing. The Supreme Court has held many times, fell against hood is a great example, but that's not true. There's a distinction in this case because on the first or the second amended complaint, the first motion to dismiss that was granted, there was no allegation of there being a renewal in process. And on that basis, the village succeeded in saying that there was no property right. And on the merits, the village was successful. What was raised in the second amended complaint is the idea of a renewal license. And that is where the standing issue comes in because they are alleging that their license was not renewed and that's where the village failed. And denied their constitutional rights, but they're not the entity that can bring that claim. That entity is Christopher Speakeasy because they are the ones who possess that license. There was- Are they also seeking damages? I'm sorry, you're on mute. Are they also seeking damages? Yes, they are seeking damages as well. So do you agree they have at least standing to seek damages? They do not have standing to seek damages from the non-renewal of their license here because they did not have a license to begin with. The damages that they would seek, if their allegations were just about the denial of an original liquor license, then if they had that right, then they could claim damages. But just on the basis of not having a renewal, that is not the right to damages. With this standing issue, if you looking at the case law on this, to your point, there must be a imminent suffering of a damage, a real or immediate injury in fact, general prohibition against raising another person's legal rights and worth be seldom. The harm and benefits must be to the plaintiff. And here, the harm was not to the plaintiff because they did not have a license that they were trying to renew and the benefit would not be to plaintiff. If this court were to find that the renewal was improperly not considered by the village, then the benefit would be to Christopher Speakeasy, which has long ceased to exist. Is there a restaurant or other business being operated in the Christopher Speakeasy position now, but location now? I believe there is, Your Honor, it is. Was it a subsequent sale to a different party or was it the original party? Do you know anything about that? I am not aware of the circumstances of that sale other than that a business license was given to a business license separate from this type of license given to that entity three or four years later. So a business license, but perhaps not liquor? I'm not sure of the specifics, Your Honor. How many I-1 licenses are issued in the village of Westchester now? Currently there are, I'm not sure, Your Honor, currently. At one point there was only one. When Christopher Speakeasy ceased to exist, there was one. I'm not aware of that number of increase. But it speaks to an important point in the merits of this case, which is we're talking about legislation. The plaintiff has raised the idea that there was animus shown by the former village president, village president Tussauds, saying that the village board is not going to do anything for you. What it is that the village board is not going to do is to pass legislation, to pass an ordinance. That's the thing that he's saying the village board will not do. The village board will not agree to. It's not about a hearing. There would be no hearing before the village board. The village board doesn't get to decide who gets a liquor license. They only decide whether there is a liquor license to obtain. So this is a question of an applicant trying to force the hand of a village, of a municipal board, to change its own ordinances. And they have no right to that. They have no ability to claim that they are being discriminated against because a municipal body doesn't want to change its ordinances. Every elected body has politics involved. And the accusation that the village has to go with whatever an applicant proposes and change their ordinances, that would kill the two-party system, which maybe some people wouldn't be opposed to. But that's what ultimately would happen here. Why wasn't the license application denied? Why is it still? There was no application to grant ordina. If there had been a, the denial would be if there was a reason to not give that license that exists to the applicant. But there was no license to give. There's nothing that the village had to do that because they applied for something that didn't exist. What happens in practicality is by applying for a license that doesn't exist, you're requesting an action by the village board. You're asking them to change their ordinances. But you don't have any right to a hearing on whether they're going to or not. You've simply made it known that you would like there to be a change in the code. And the village board then has the discretion to decide whether or not to do so. So the board doesn't then return the licensing fee and communicate in any way back to the applicant? The licensing fee is part of the processing. The application was still processed. It was looked over. It was reviewed by members of the village and village board. As the allegations of the complaint state, they had an appearance before the village board. The attorney for the applicant presented in front of the village board. Melissa Headley, the community economic development director went back to the applicant and suggested, here's a way that we would be willing to change our ordinances for you. Would you go along with this? And they denied it. They had an opportunity, a back and forth. They knew full well that they were not getting their license or not getting the creation of a license. With regard to the equal protection argument and the idea of animus being enough to subvert rational basis, that is not what this court has consistently held in many other cases after OLEG. OLEG really didn't deal with the idea of rationality, but this court has consistently stated afterwards that a rational basis is something that can overcome animus. If you look at the case of, pardon me, it's Fares Pond LLC, the Indiana Department of Financial Institutions, rational basis for government action defeats a class of one claim, animus or no. There only needs to be a conceivable rational basis. It doesn't need to be an established or proven rational basis or even alleged as long as it is conceivable. And in this case, there is a conceivable rational basis that was disclosed to the applicant that the village board did not want to increase gaming. They didn't want to give this type of license that is a particular type of license. There are other licenses that allow gaming. There are other licenses that allow liquor. They did not want to grant an I-1 license that was both a bar and a gaming facility. That's why they proposed something alternative. So there was a rational basis, animus or no. Assuming all allegations of complaint are true, that doesn't matter that there was animus because there still was a rational basis for them to fall back. Flying J. Inc. versus City of New Haven, rational basis and animosity can coexist. And that's what has occurred here. I would like to close on the discretion idea that there is broad discretionary authority to regulate liquor licenses. Under the Liquor Control Act of 1934, the village board has the authority to determine not only the number of licenses and classifications licenses, but the process for even obtaining a liquor license. The discretion has been given by the state to the village board. And that is what the village board exercised here in this case. There's no prohibition against choosing not to adopt legislation. That is a discretionary decision by the legislators, by the village board, the trustees. Cass Crank versus Haskett, a case in the circuit in 2016, stated that you cannot base a class of one on actions within the government's discretion. And that is what we have here. There are no further questions. I thank you very much. And I ask you to affirm the lower court's ruling. Thank you, Mr. Morton. Mr. Bolton, we'll move now back to you for Roboto-Larkin. May I please correct? I believe that what has happened at the district court and now what's happened in my colleague's argument is that it is trees and forests going on here. They're trying to make you look at individual trees. Well, there's this or that. We ask you to step back and look at the forest of this entire scheme against Michael Lanzo, not just these individual. Yes, the board had discretion. Yes, they appear before the board once for discussion with no action ever taken. And the mayor is saying there's no action ever going to be taken. However, I also point out that while they talk about that Christopher's licensing, I only urge the court to remember that our people were deflected from that by direction of the person who was the intake person for the village. They were directed not to do it. File your own one. And they accepted the direction of the village commission. As far as some of it, I believe my colleague is a little bit guilty of extrapolating facts outside of the complaint at 12B6, trying to bring up the discretion and other elements of the board. This is a 12B6 motion. We are on the facts. Senator Nielsen complained not the opinions about what the board could or couldn't do. Our third point, Your Honor, is that the board had discretion to issue a new license. The board had pretty much discretion to do whatever it want. It was not handcuffed by its regulations because it could simply issue another I-1 license. As far as anonymous or no, I believe, Your Honor, I believe that gets us across the issue. That if that rule, anonymous or no, is cloaking intentional harm, there has to be an exception when there is admitted in the complaint that the facts taken is true, but the village president, who could else be a spokesman for this village, but the village president, stated that there was animus and stated not only that there was animus, but that animus motivated the fact that they were never going to get a license. It simply seems to us the crux of this case, Your Honor, is that when that admission is right there in the complaint and that witness could testify to it, then we are beyond the ability of tests of law that are simply divining discrimination and we are improperly using them to define discrimination. When you look at that quote, and I'll leave with that quote, Your Honor, on the Supreme Court that was cited in OLEC in their opinion affirmings, the purpose of the Equal Protection Clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination. Irrationality isn't in there. It is not a protection against irrational, it is protection against discrimination by the government. And when that discrimination is plain upon the face of the complaint, that case has to be allowed to go forward. We ask you to vacate the order and refer the case back for further proceedings. Thank you, Your Honor. Thank you, Mr. Bolton. Thank you, Mr. Wharton. The case will be taken under revival.